## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Feb 18 2020, 8:11 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT K.S.

Cynthia Phillips Smith
Law Office of Cynthia P. Smith
Lafayette, Indiana

ATTORNEY FOR APPELLANT K.B.-K.

Steven Knecht
Vonderheide & Knecht, P.C.
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Involuntary Termination of the Parent-Child Relationship of K.B. (Minor Child) <br><br> and <br><br> K.S. (Mother) and K.B.-K. (Father), <br><br> *Appellants-Respondents,* <br><br> v. | February 18, 2020 <br><br> Court of Appeals Case No. 19A-JT-2126 <br><br> Consolidated Appeal from the Tippecanoe Superior Court <br><br> The Honorable Faith A. Graham, Judge <br><br> Trial Court Cause No. 79D03-1902-JT-16 |

Indiana Department of Child
Services,

*Appellee-Petitioner*

**Crone, Judge.**

# Case Summary

K.S. ("Mother") and K.B.-K. ("Father") (collectively "Parents") appeal the trial court's order involuntarily terminating their parental rights to their minor child, K.B. ("Child"). Finding no error, we affirm.

# Facts and Procedural History

Parents are the biological parents of Child, who was born in February 2012. In August 2017, the Indiana Department of Child Services ("DCS") received a report alleging neglect due to Mother's substance abuse. Mother, who was living with a friend, submitted to an oral drug screen that came back negative. Mother consented to a hair drug screen for Child, which came back positive for methamphetamine. Father could not be located. Child was placed in protective custody, and DCS filed a petition alleging that Child was a child in need of services ("CHINS"). By the time of the CHINS factfinding hearing in October 2017, both Mother and Father had tested positive for methamphetamine. The trial court found that Child was a CHINS. In December 2017, the trial court issued a dispositional order pursuant to which Mother was offered "substance abuse assessment and treatment, case

management, random drug screens, and parenting time[,]" and Father was offered "clinical interview/mental health assessment, substance abuse assessment and treatment, random drug screens, and parenting time." Appealed Order at 2, 3.

[3]     In February 2019, DCS filed petitions to terminate Parents' parental rights. A two-day factfinding hearing was held in April 2019. In July 2019, the trial court issued an order containing the following relevant findings and conclusions:[1]

### FINDINGS OF FACT

....

5. .... Child has been placed outside the home for more than fifteen (15) of the most recent twenty-two (22) months.

....

9. Mother completed a substance use assessment but failed to attend recommended treatment. During the CHINS proceedings, Mother tested positive for the presence of drugs on 08/20/2018 (amphetamine and methamphetamine), 08/28/2018 (amphetamine and methamphetamine), and 08/29/2018 (amphetamine and methamphetamine). Mother failed to submit to all drug screens as requested.

10. Mother's criminal history includes Possession of Methamphetamine and Dealing in Methamphetamine. During the CHINS case, Mother was incarcerated from May 2018 [sic]

---

[1] We have replaced references to the parties' names and initials with the aforementioned designations.

to April 2018. Mother was again incarcerated at the end of September 2018 and remains incarcerated to date. Mother's earliest release date is May 7, 2019. However, Mother is awaiting sentencing on a Petition to Revoke Probation.

11. Mother failed to maintain contact with DCS and failed to consistently participate in services when not incarcerated. Mother's last participation in any services was April 2018. Mother was found in contempt on July 31, 2018.

12. In October 2018, Mother expressed a desire to consent to adoption. Mother executed documents consenting to Child's adoption on November 29, 2018. Mother admitted a long history of substance use and incarceration which has not been addressed.

13. Nevertheless, Mother does not support termination of Father's parental rights. Mother acknowledges that Father continues to use marijuana and has failed drug screens for suboxone and opiates. However, Mother reports no safety concerns for Child in Father's care.

14. Father is twenty-four (24) years of age and has been incarcerated most of Child's life. Father was arrested in September 2012 for Dealing a Schedule IV Controlled Substance for which he was sentenced to eight (8) years' incarceration. Father was initially released in 2014 after which he used marijuana and was returned to incarceration for another eighteen (18) months. Father was again released for only one (1) month before returning to incarceration for failure to update his address. Father was released in March 2016 on parole which he completed in August 2017. Father was charged with Possession of Spice in April 2016 and convicted. Father was initially placed on Home Detention but was transferred to Work Release after law enforcement was dispatched to Father's home regarding a domestic dispute. Father is currently on unsupervised probation. Father also reported an obstruction of justice charge for eating

marijuana.

15.  Father was in a car accident resulting in a broken hand, tailbone, and back.  Father also suffered other broken bones as a child.  Father admits using illegal substances to manage stress and cope with pain.  Father tested positive for suboxone or opiates throughout [the] CHINS case.  Father has no prescription for suboxone.  Prior to the CHINS case, Father never attempted substance abuse treatment with the exception of a few drug classes in prison.

16.  Father completed a substance use assessment in October 2017.  Father reported his drug of choice is marijuana and that he started using marijuana at age twelve (12) and continued until incarceration in 2012.  Father was in and out of incarceration from 2012 to 2017.  Father continued marijuana use after release from incarceration in 2017.  Father also reported past use of spice, klonopin, Xanax, and hydrocodone without a prescription.  Father reported a prior diagnosis of ADHD and Bipolar Disorder for which Father was prescribed Adderall, Vyvanse, and Concerta.  However, Father ceased taking prescriptions in favor of self-medication with marijuana.  Father reported no problem with current substance use.  Father was diagnosed with Marijuana Use Disorder.  It was recommended that Father participate in services and develop a relapse prevention plan.  Father reported he could quit using drugs if he needed to quit or wanted to quit.  However, Father failed to do so even when reunification with Child was at stake.  At the time of the termination hearing, Father admitted he would likely test positive for marijuana.

17.  During the CHINS proceedings, Father tested positive for the presence of drugs [i.e., methamphetamine, amphetamine, alcohol, marijuana, buprenorphine, and/or opiates on approximately three dozen occasions between August 2017 and January 2019].  Other drug screen results through January 2019 were negative however, he failed to take any drug screens as

ordered since January 2019.

18. Father was referred for individual therapy in December 2017. However, Father failed to attend as recommended despite constant reports of stress. Father has completed no other substance abuse treatment and continues to use illegal substances.

19. Father was referred for case management services in October 2017 but did not begin until March 2018. At that time, Father had housing and worked with a landlord to relocate to a new trailer due to structural issues. Father was initially unemployed but obtained a job and established a budget. Father had a working knowledge of community resources. Father was discharged from services at the end of November 2018 for lack of recent engagement.

20. Father resumed case management services in January 2019. Father has attended only six (6) of thirteen (13) scheduled sessions. Father maintained housing. Father acknowledges eviction proceedings filed but denies any orders for eviction. Father obtained a driver's license permit, utilizes the bus system, and drives a registered moped. Father established a sustainable budget having recently changed employment for increased pay.

21. Father married his wife, Kendra, in June 2017. Father reports marital struggles resulting in a separation. Father's wife and their infant son have been residing with the wife's mother in Monticello since January 2019. Father's wife is diagnosed with PTSD and does not always take medication as prescribed. Father admits law enforcement has been involved several times.

22. In October 2017, law enforcement responded to Father's residence for a fight with his wife. Father was observed with a greenish bruise and a scratch near his eyebrow. On January 22, 2018 law enforcement again responded to Father's home for a fight with his wife at which time paraphernalia was located at the

home. On April 18, 2018, law enforcement responded to Father's home for another domestic dispute. On September 26, 2018, another domestic disturbance occurred at which time Father's newborn son was reportedly present. Service providers alerted DCS of safety concerns with Father's newborn infant including observation of blankets placed over the infant as a suffocation risk and bottles propped for feeding as a choking concern. Father's infant son has not been removed from the care of his parents.

23. On October 26, 2018, law enforcement again responded to another disturbance with the wife at which time Child was present. Shortly after, Father and his wife separated although the wife and newborn infant occasionally slept at Father's home until the wife moved out completely in January 2019. Father denies any physical violence reporting that it was never proven, and he was never incarcerated. At the time of the termination hearing, Father stated he still loved his wife and that he "did not get married to get a divorce".

24. Father was referred to the Character Restoration program for domestic violence/anger management on three (3) separate occasions. Father did not commence Character Restoration until December 2018. Father attended only five (5) sessions and failed to complete the program. Father reported there is nothing to learn from the program due to the angry demeanor of the teacher. Father's wife also did not attend as recommended.

25. Father commenced parenting time in October 2017 which continues to date. Father's parenting time occurs in the community and at Father's home. Father is prepared with supplies during parenting time usually occurring three (3) times per week between 5:00PM and 8:00PM. Father's interactions with Child are positive with an observable bond. Father supports Child's education and uses appropriate discipline as needed.

26. Father's parenting time was initially fully supervised. On

August 3, 2018, a visit ended early due to an argument between Father and his wife involving loud voices and the wife threatening to contact law enforcement if Father did not leave. Nevertheless, Father progressed to semi-supervised parenting time with drop-in monitoring only during overnight visits that occurred for approximately three (3) weeks in early October 2018. However, in October 2018, a domestic violence incident occurred in Child's presence resulting in increased supervision.

27. Although Father has maintained employment and housing during the CHINS case, Father has failed to complete any service to address repeated substance use and domestic violence.

28. CASA Staff Advocate, Leigh Ann Fricke, supports termination of parental rights in the best interests of Child. CASA noted Father['s] lack of compliance with drug screens and failure to complete services to address substance use and domestic violence and Mother's incarceration. CASA further noted that Father's progress regressed when domestic violence incidents involving law enforcement began. CASA observed that neither parent is stabilized to the extent needed to provide for Child's needs. Child participates in school-based case management and school-based counseling and performs well in school. Child is very active but is sometimes confused by her circumstances. Child is bonded with the kinship placement where she resides with her siblings. Child is adoptable even if the current placement is unable to adopt for any reason.

**CONCLUSIONS OF LAW**

1. There is a reasonable probability the conditions that resulted in removal of Child from the care of the parents or the reasons for continued placement outside the home will not be remedied. Neither parent has successfully completed services to address substance abuse issues.

2.  Continuation of the parent-child relationships poses a threat to the well-being of Child who needs stability in life.  Child needs parents with whom she can form a permanent and lasting bond to provide for her emotional and psychological as well as physical well-being.  Child's well-being would be threatened by keeping her in parent-child relationships with either parent.  Mother has failed to establish any stability and Father has failed to complete any services to address domestic violence.

3.  DCS has a satisfactory plan of adoption for the care and treatment of Child following termination of parental rights.  Child can be adopted and there is reason to believe an appropriate permanent home has or can be found for Child with siblings.  Mother has consented to adoption.

4.  For the foregoing reasons, it is in the best interests of Child that the parental rights of Mother and Father be terminated.

*Id*. at 2-6.  Parents now appeal.[2]

## Discussion and Decision

[4] "Parents have a fundamental right to raise their children—but this right is not absolute.  When parents are unwilling to meet their parental responsibilities, their parental rights may be terminated."  *Matter of Ma.H.*, 134 N.E.3d 41, 45-46 (Ind. 2019) (citation omitted).  A petition for the involuntary termination of parental rights must allege in pertinent part:

---

[2] DCS does not specifically argue that Mother's appeal is moot because she filed a consent to Child's adoption, and Mother cites no authority for her suggestion that the consent was ineffective because it "was not admitted into trial in this case."  Mother's Br. at 16.  Absent any definitive indication that Child's adoption has been finalized, we elect to address the merits of Mother's appeal.

(A) that one (1) of the following is true:

  ….

  (iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

  (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

  (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

  (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).

[5] DCS's "burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2). This heightened burden reflects termination's "serious social consequences." *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014) (quoting *id*. at 1260 n.1). If the trial court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[6] Our standard of review in termination cases is highly deferential. *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 92 (Ind. Ct. App. 2014).

> We neither reweigh evidence nor assess witness credibility. We consider only the evidence and reasonable inferences favorable to the trial court's judgment. Where the trial court enters findings of fact and conclusions thereon, we apply a two-tiered standard of review: we first determine whether the evidence supports the findings and then determine whether the findings support the judgment. In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous.

*Id.* at 92-93 (citations omitted). "A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." *In re A.G.*, 45 N.E.3d 471, 476 (Ind. Ct. App. 2015), *trans. denied* (2016). Unchallenged findings are accepted as true. *McMaster v. McMaster*, 681 N.E.2d 744, 747 (Ind. Ct. App. 1997).

# Section 1 – The trial court did not clearly err in concluding that there is a reasonable probability that the conditions that resulted in Child's removal will not be remedied.

[7] Initially, Mother contends that the trial court clearly erred in concluding that there is a reasonable probability that the conditions that resulted in Child's removal will not be remedied. In determining whether the conditions that resulted in a child's removal will not be remedied, we perform a two-step analysis. *E.M.*, 4 N.E.3d at 642-43. First, we identify the conditions that led to removal, and then "we 'determine whether there is a reasonable probability that those conditions will not be remedied.'" *Id.* (quoting *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013)). Next, a parent's fitness must be judged "as of the time of the termination proceeding, taking into consideration evidence of changed conditions—balancing a parent's recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation." *Id.* (citations, quotation marks, and alteration omitted). "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *Id.* "Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior." *Id.*

[8] Here, Child was removed from Mother because of neglect and Mother's illegal drug use. Mother completed a substance abuse assessment but failed to attend

treatment, failed to submit to all drug screens, and tested positive for illegal drugs on multiple occasions. Mother complains that "DCS failed to present any current evidence of [her] drug use during the trial in this matter." Mother's Br. at 12. Mother ignores the fact that she was incarcerated at the time of trial,[3] was incarcerated during the CHINS proceeding, and failed to maintain contact with DCS and consistently participate in services when not incarcerated. She has a criminal history involving possession of and dealing in methamphetamine, and she was awaiting sentencing on a petition to revoke probation. Based on Mother's longstanding drug and legal problems and lack of stability, we cannot conclude that the trial court clearly erred in determining that there is a reasonable probability that the reasons for Child's removal will not be remedied.[4]

## Section 2 – The trial court did not clearly err in concluding that termination of Mother's parental relationship is in Child's best interests.

[9] Mother also contends that the trial court clearly erred in concluding that termination of her parental relationship is in Child's best interests. To

---

[3] Although the trial court did not make a specific finding on this point, we note that DCS permanency worker Shalonda Haskins testified that when Mother voluntarily relinquished her rights to another child at a hearing held earlier that day, she "indicate[d] that she was having a lot of problems over coming [sic] her drug problem" and that her seven months in jail was the "longest that she has been clean." Tr. Vol. 2 at 112, 113. Mother's failure to stay clean and avail herself of treatment when she was not incarcerated would not bode well for her prospects of remedying the conditions that led to Child's removal.

[4] Because Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive, we need not address Mother's argument that the trial court clearly erred in concluding that there is a reasonable probability that continuation of the parent-child relationship poses a threat to Child's well-being.

determine what is in a child's best interests, the court must look at the totality of the circumstances. *In re A.W.*, 62 N.E.3d 1267, 1275 (Ind. Ct. App. 2016). "In so doing, the court must subordinate the interests of the parents to those of the child involved." *In re S.K.*, 124 N.E.3d 1225, 1234 (Ind. Ct. App. 2019), *trans. denied*. "The trial court need not wait until the child is irreversibly harmed such that his physical, mental, and social development is permanently impaired before terminating the parent-child relationship." *Id.* Although not dispositive, permanency and stability are key considerations in this regard. *G.Y.*, 904 N.E.2d at 1265. "A parent's historical inability to provide a suitable environment along with the parent's current inability to do the same supports a finding that termination of parental rights is in the best interests of the children." *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 373 (Ind. Ct. App. 2007), *trans. denied*. "Further, the testimony of the service providers may support a finding that termination is in the child's best interests." *S.K.*, 124 N.E.3d at 1234.

[10] Mother's only argument regarding Child's best interests is that she "was not questioned about what she believed was in the best interest of her child." Mother's Br. at 17. No such questioning was required. The totality of the circumstances as documented by the trial court's unchallenged findings, including CASA Fricke's opinion that termination is in Child's best interests, and Mother's history of incarceration and substance abuse, amply support the trial court's conclusion that termination of Mother's parental relationship is in

Child's best interests.  Accordingly, we affirm the trial court's termination order as to Mother.

## Section 3 – The trial court did not clearly err in concluding that termination of Father's parental relationship is in Child's best interests.

[11]    Father challenges only the trial court's conclusion that termination of his parental relationship is in Child's best interests.[5]  He points to the progress that he has made in obtaining stable housing and employment and the bond that he has established with Child.  But he disregards the CASA's opinion that termination is in Child's best interests, as well as the unchallenged findings regarding his longstanding (and ongoing) use of marijuana, methamphetamine, and other illegal drugs, even when reunification with Child was at stake; his failure to take drug screens after January 2019; and his failure to participate in services related to his substance abuse and domestic violence issues, which resulted in multiple instances of police involvement.[6]  Looking at the totality of the circumstances, including Child's need for permanency and stability and Father's past and current inability to provide a suitable environment for Child,

[5] Father states, "It is not enough that the conditions in the parent's care be in need of improvement:  the relationship must pose an actual threat to the child's well-being."  Father's Br. at 20.  But Father does not specifically challenge the trial court's conclusion that there is a reasonable probability that continuation of the parent-child relationship poses a threat to Child's well-being.

[6] Father states that "[t]he only evidence presented concerning domestic violence indicates that [he] was the victim" and that he "and his wife have since separated," and therefore Child "would not be in her presence[.]"  Father's Br. at 18-19.  Exposure to domestic violence is harmful to a child's development regardless of the victim's identity, and Father has not foreclosed the possibility of reuniting with his wife (who was also resistant to domestic violence counseling) at some point.

we cannot conclude that the trial court clearly erred in determining that termination of Father's parental relationship is in Child's best interests. Therefore, we affirm the trial court's termination order as to Father.

[12] Affirmed.

May, J., and Pyle, J., concur.