

I N  T H E

# Court of Appeals of Indiana

In re the Involuntary Termination of the Parent-Child Relationship of E.P. and M.P. (Minor Children) and E.C. (Father),

*Appellant-Respondent*



FILED

Aug 27 2025, 9:23 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

---

August 27, 2025

Court of Appeals Case No.
25A-JT-84

Appeal from the Hamilton Circuit Court

The Honorable Valorie S. Hahn, Magistrate

Trial Court Cause Nos.
29C01-2404-JT-629
29C01-2404-JT-630

---

**Opinion by Judge Mathias**

Chief Judge Altice and Judge DeBoer concur.

**Mathias, Judge.**

E.C. ("Father") appeals the trial court's termination of his parental rights over his two minor children, E.P. and M.P. ("the Children"). Father raises two issues for our review, which we restate as the following three issues:

> 1. Whether the trial court in the underlying child-in-need-of-services ("CHINS") proceedings[1] violated Father's statutory right to counsel when it did not reappoint counsel for him after Father's original counsel withdrew his representation.
>
> 2. Whether our Supreme Court's holding in *In re G.P.*, 4 N.E.3d 1158, 1167-68 (Ind. 2014), that the deprivation of the statutory right to counsel in an "inextricably linked" CHINS proceeding always requires vacating a subsequent termination judgment, applies here.
>
> 3. Whether the trial court's termination of Father's parental rights is clearly erroneous.

We hold that the trial court in the CHINS proceedings violated Father's statutory right to counsel when it did not reappoint him counsel that he had requested and to which he was entitled. But we also hold, as a matter of first impression, that our Supreme Court's holding in *In re G.P.* does not apply to the

---

[1] The same judicial officer presided over Father's CHINS and termination proceedings.

unique circumstances in this case because the factual foundation for the termination decision here was based on the parent's convictions and incarceration for molesting his own daughter, not, as was the case in *G.P.*, on the failure of the parent to comply with services in the underlying CHINS proceedings. And we hold that the Indiana Department of Child Services ("DCS") presented sufficient evidence to support the trial court's judgment to terminate Father's parental rights.

[3] Accordingly, we affirm the trial court's judgment.

## Facts and Procedural History

[4] In 2019, Father molested his then-eight-year-old daughter M.P. in the presence of his then-eleven-year-old son E.P. The State charged Father with Level 1 felony child molesting and Level 4 felony child molesting, and a jury found him guilty of both counts. The trial court entered its judgment of conviction on both counts and sentenced Father to an aggregate term of forty-three years in the Department of Correction. On appeal, we affirmed Father's convictions and sentence.

[5] Contemporaneously with the filing of the State's information in the criminal proceedings, in December 2019, DCS filed petitions alleging the Children to be CHINS based on the pending criminal allegations. Father appeared at the initial CHINS hearing and requested counsel; the court found him indigent and appointed counsel for him. As Father's first language is not English, the court also appointed an interpreter for him.

[6]     In April 2020, Father admitted that the Children were CHINS, and the court adjudicated the Children to be CHINS based on that admission and Father's incarceration on the State's charges.[2] Following an August 2020 dispositional hearing, the court ordered Father to stay in contact with DCS and to assist in any necessary releases or medical needs for the Children,[3] but the court did not order Father to participate in any specific assessments or services. In June 2021, after his criminal trial, the court found that Father's convictions and incarceration made him noncompliant with the Children's case plan, and the court changed the Children's placement plan from reunification to adoption. Ex. Vol. 3, p. 23. The court then entered its order approving that permanency plan.

[7]     In November 2021, the court conducted a periodic review hearing. Father appeared at that hearing through his appointed counsel. Following that hearing, the trial court found that Father "intends to sign consents for adoption. Father's counsel has requested a new hearing to be held in person so that he can consult with [F]ather regarding signing consents for adoption." *Id.* at 26.

[8]     The court held that hearing in late May 2022; Father appeared at that hearing in person and by counsel, along with an interpreter, and "signed [adoption]

---

[2] The court also recognized that the Children's biological mother is deceased.

[3] The court also directed Father to comply with other conditions obviously not relevant to a person who is incarcerated. *See* Appellant's App. Vol. 2, p. 26 (ordering Father to keep DCS apprised of any changes in his employment and to allow DCS to conduct home visits).

consents at the [h]earing."[4] *Id.* at 31, 78. In early July, Father's counsel moved to withdraw his appearance on the ground that the scope of his representation of Father in the CHINS proceedings "was completed." Appellant's App. Vol. 2, p. 28. The court granted that motion the next day.

[9] However, issues with the Children's status as noncitizens delayed adoption proceedings, and the trial court continued to hold review and permanency hearings in the CHINS proceedings. But the court did not appoint new counsel for Father after the withdrawal of Father's counsel in July 2022, and Father did not personally appear before the court again in the CHINS proceedings until an April 2024 review hearing.

[10] Also in April 2024, DCS filed its petition to terminate Father's parental rights. The court appointed counsel for Father in the termination proceedings at an initial hearing. Some six months later, on November 4, 2024, the court also appointed that same counsel to represent Father in the concurrent and ongoing CHINS proceedings.

[11] On November 21, the court held the fact-finding hearing on DCS's petition to terminate Father's parental rights. Thereafter, based on the facts underlying Father's convictions and his sentence, the testimony of representatives for the Children, DCS's continued efforts to have the Children be adopted, and the

---

[4] Father's executed consents are not in the record on appeal.

Children's progress in foster care, the court ordered that Father's parental rights over the Children be terminated.

[12] This appeal ensued.

## Standard of Review

[13] Indiana appellate courts have long adhered to a highly deferential standard of review in cases involving the termination of parental rights. *In re S.K.*, 124 N.E.3d 1225, 1230-31 (Ind. Ct. App. 2019). In analyzing the trial court's decision, we neither reweigh the evidence nor assess witness credibility. *Id.* We consider only the evidence and reasonable inferences favorable to the court's judgment. *Id.* In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.*

[14] To determine whether a termination decision is clearly erroneous, we apply a two-tiered standard of review to the trial court's findings of facts and conclusions of law. *Bester v. Lake Cnty. Off. of Fam. & Child.*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings; second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *In re A.D.S.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied*. If the evidence and inferences support the court's termination decision, we must affirm. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct.

App. 1999), *trans. denied*. We will accept unchallenged factual findings as true. *See In re S.S.*, 120 N.E.3d 605, 614 n.2 (Ind. Ct. App. 2019).

[15] It is well-settled that the parent-child relationship is one of society's most cherished relationships. *See, e.g.*, *In re A.G.*, 45 N.E.3d 471, 475 (Ind. Ct. App. 2015), *trans. denied*. Indiana law thus sets a high bar to sever that relationship by requiring DCS to prove several elements by clear and convincing evidence. Ind. Code § 31-35-2-4(c), (d) (2024). Clear and convincing evidence need not establish that the continued custody of a parent is wholly inadequate for a child's very survival. *Bester*, 839 N.E.2d at 148. It is instead sufficient to show that the child's emotional and physical development are put at risk by the parent's custody. *Id.* If the trial court finds the allegations in a petition are true, the court must terminate the parent-child relationship. I.C. § 31-35-2-8(a).

## 1. The trial court's failure to appoint counsel for Father between July 2022 and November 2024 in the CHINS proceedings violated Father's statutory right to counsel.

[16] On appeal, Father first argues that the failure of the trial court to appoint him counsel in the CHINS proceedings after his first counsel withdrew his appearance violated Father's due process rights. On this threshold issue, we agree with Father. Father had a statutory right to counsel during the CHINS proceedings: he requested counsel at the initial hearing, and the court found him indigent. I.C. § 31-34-4-6(a)(2). And Father never expressed a contrary intent to the court. Thus, upon his initial counsel's withdrawal of his representation of Father in July 2022, it was incumbent on the trial court to

appoint new counsel for Father for as long as the CHINS proceedings remained open.

[17] DCS argues that Father waived his right to counsel by not reasserting that right upon the withdrawal of his first counsel. We do not agree. Father affirmatively informed the court at the initial hearing that he wished to proceed with counsel, and, again, nothing in the record demonstrates that he ever changed his mind. Thus, we agree with Father that the trial court violated his statutory right to counsel in the CHINS proceedings when it left Father without counsel between July 2022 and November 2024.

## 2. Our Supreme Court's "bright line rule" of reversal of termination judgments when the statutory right to counsel in an underlying CHINS proceeding has been violated is not applicable here.

[18] Having concluded that the trial court violated Father's statutory right to counsel in the CHINS proceedings, we thus turn to the gravamen of Father's argument, namely, whether our Supreme Court's opinion in *In re G.P.* compels us to reverse the termination of his parental rights. Our Supreme Court's opinion in *In re G.P.* focused on the relationship between a termination judgment and a CHINS proceeding leading up to that judgment. In particular, on appeal from a termination judgment, our Supreme Court first held that the trial court had violated the parent's statutory right to counsel during the parent's antecedent CHINS proceeding when the court did not appoint counsel for the parent

despite her request for counsel and the court's finding that she was indigent. 4 N.E.3d at 1165-66.

[19] The Court then proceeded to discuss the "[i]mpact of the Due Process [v]iolation." *Id.* at 1166 (bold font removed). The Court noted that CHINS, termination, and adoption proceedings typically "line up somewhat like dominoes" such that a subsequent proceeding usually cannot "fall without being pushed by the proceeding before it." *Id.* The Court further noted that, had the parent's statutory right to counsel during the CHINS proceeding been properly observed, counsel could have taken any number of actions that "could have changed the tenor and direction of the CHINS process and perhaps prevented the [termination] proceeding altogether . . . ." *Id.* at 1168. The Court also recognized that, "without question[,] it was fundamentally unfair to tell [the parent] she would receive appointed counsel, as she was entitled to by statute, and then not follow through with the appointment but instead continue with [CHINS] proceedings challenging her fitness as a parent." *Id.*

[20] In light of the interrelationship between the CHINS and termination proceedings in that case, our Supreme Court concluded that the parent had no burden on appeal to show prejudice from the denial of her statutory right to counsel during the CHINS proceeding. *Id.* at 1167. Instead, because the CHINS and termination proceedings in *In re G.P.* were "inextricably linked" such that "the defectiveness of one inevitably ha[d] a destructive collateral impact on the other," the Court held as a "bright-line rule" that the denial of the statutory

right to counsel in the CHINS proceeding required reversal of the ensuing termination judgment. *Id.* at 1167-68.

[21] That brings us to Father's appeal. Father reasonably argues that our Supreme Court's "bright-line rule" in *In re G.P.* requires reversing the termination judgment here due to the trial court's violation of his statutory right to counsel in the antecedent CHINS proceedings. But we do not agree. We read *In re G.P.*'s bright-line rule to apply to circumstances in which the basis for a termination is a parent's failure to comply with the services offered during the prior CHINS proceedings. That is, if the substantive basis for a termination judgment derives from the parent's actions or inactions during the CHINS proceedings, then the denial of the statutory right to counsel during the CHINS proceedings will always require vacating an ensuing termination judgment. *Id.*

[22] But that is not what happened here. The trial court's termination of Father's parental rights was based on his molestation of M.P. in the presence of E.P. and his ensuing convictions and incarceration for that molestation, not on his actions or inactions during the CHINS proceedings. Accordingly, we decline to apply *In re G.P.* here.

[23] Still, Father contends that the denial of his statutory right to counsel during the CHINS proceedings was meaningful because, during the timeframe in which the CHINS proceedings were ongoing but Father was not represented, the trial court "routinely f[ound] that Father was not compliant in services in a case in which he was not ordered to complete any actual services." Appellant's Br. at

15. But Father misunderstands the court's routine statements. In June 2021, after Father's criminal trial and while Father was represented by counsel in the CHINS proceedings, the court found that Father's convictions and incarceration made him noncompliant with the Children's case plan. And that is also the basis for the termination court's judgment. At no point in-between those two events did the trial court in either proceeding say that Father was noncompliant for some other reason. We therefore read the trial court's routine assessments throughout the CHINS proceedings regarding Father's noncompliance to simply be an ongoing recognition of Father's convictions and incarceration.

[24] Finally, this analysis leaves us to determine the probable impact of the trial court's denial of Father's statutory right to counsel on the outcome of his termination proceeding. *See Hayko v. State*, 211 N.E.3d 483, 491-92 (Ind. 2023). And, again, as the termination judgment was premised on Father's convictions and incarceration for molesting his child and not on his actions or inactions during the CHINS proceedings, we conclude that the court's erroneous deprivation of Father's statutory right to counsel was harmless.

## 3. The trial court's termination of Father's parental rights is not clearly erroneous.

[25] Father's last argument on appeal is that the trial court erred when it terminated his parental rights because DCS did not present sufficient evidence to show that it had a satisfactory plan for the care and treatment of the Children. *See* I.C. § 31-35-2-4(c)(2). As we have explained:

> Indiana courts have traditionally held that for a plan to be "satisfactory," for the purposes of the termination statute, it need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated. A DCS plan is satisfactory if the plan is to attempt to find suitable parents to adopt the children. In other words, there need not be a guarantee that a suitable adoption will take place, only that DCS will attempt to find a suitable adoptive parent. Accordingly, a plan is not unsatisfactory if DCS has not identified a specific family to adopt the children. Part of the reason for this is that it is within the authority of the adoption court, not the termination court, to determine whether an adoptive placement is appropriate.

*In re A.S.*, 17 N.E.3d 994, 1007 (Ind. Ct. App. 2014) (quotation marks and citations omitted), *trans. denied*.

[26] At the fact-finding hearing on the termination petition, permanency case manager Danielle Shelton testified that the Children were noncitizens and DCS was working with immigration officials to "get[] [the Children] their green cards so that they can be adopted." Tr. Vol. 2, p. 21. She acknowledged that the green-card-to-adoption process was "probably" going to take "years" to complete. *Id.* at 22. That said, the Children had executed consents to be adopted by their current foster family, with whom the Children have lived since 2019. *Id.* at 23-24.

[27] Father argues that Shelton's testimony was insufficient to establish a satisfactory plan for the Children's placement because she was unable to guarantee that the Children would ever receive their green cards and, thus, actually be adopted. But DCS did not need to show that adoption would in fact

happen; DCS only needed to show a "plan" to "attempt" to have the Children adopted. *In re A.S.*, 17 N.E.3d at 1007. Shelton's testimony was sufficient to meet that burden, and we therefore affirm the trial court's termination of Father's parental rights.

## Conclusion

[28] For all of these reasons, we affirm the trial court's judgment.

[29] Affirmed.

Altice, C.J., and DeBoer, J., concur.

ATTORNEY FOR APPELLANT

Michael C. Price
Zionsville, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana